IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


ERIC S. THEORGOOD,
     Petitioner,

vs.                        Case No.:  3:16cv383/LAC/EMT

JULIE L. JONES,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 10).  Petitioner filed a reply (ECF No. 20).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the

opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 10).[1]  Petitioner was charged in the Circuit Court in and for Santa Rosa County, Florida, Case No. 2012-CF-547, with one count of burglary of an occupied dwelling while wearing a mask or hood (Ex. A at 52). Following a jury trial, Petitioner was found guilty as charged (*see* Ex. A at 56–57, Ex. L).  On January 9, 2013, Petitioner was sentenced to seven (7) years in prison (Ex. A at 135–39).  Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D13-230 (Ex. A at 143).  He subsequently filed a notice of voluntary dismissal, and the First DCA dismissed the appeal on May 28, 2013 (Exs. B, C).

On June 6, 2013, Petitioner filed a motion to modify sentence in the trial court, pursuant to Rule 3.800(c) of the Florida Rules of Criminal Procedure (Ex. D at 1–4). The trial court denied the motion on July 8, 2013 (*id.* at 7–8).

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 10).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Case No.:  3:16cv383/LAC/EMT

On October 3, 2013, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. D at 36–55). In an order rendered October 31, 2013, the state circuit court dismissed the motion on procedural grounds, without prejudice to Petitioner's filing an amended motion within 60 days (*id.* at 58–59). Petitioner filed an amended motion on November 13, 2013 (*id.* at 62–87). In an order rendered December 16, 2013, the circuit court again dismissed the motion on procedural grounds, without prejudice to Petitioner's filing an amended motion within 60 days (*id.* at 88–89). Petitioner filed a second amended motion on January 6, 2014 (*id.* at 92–118). In an order rendered February 12, 2014, the circuit court struck the motion as facially insufficient, without prejudice to Petitioner's filing a third amended motion within 60 days (*id.* at 119–20). Petitioner filed a third amended Rule 3.850 motion on April 14, 2014 (*id.* at 127–59). The circuit court appointed counsel to represent Petitioner and held a limited evidentiary hearing (Ex. D at 192–93, Ex. E at 204–05, Ex. F). Following the evidentiary hearing, the circuit court denied Petitioner's third amended Rule 3.850 motion (Ex. E at 220–26). Petitioner appealed the decision to the First DCA, Case No. 1D15-2944 (Ex. G). The First DCA affirmed the decision per curiam without written opinion on April 29,

2016, with the mandate issuing June 30, 2016 (Ex. H). <u>Theorgood v. State</u>, 192 So. 3d 522 (Fla. 1st DCA 2016) (Table).

Petitioner filed the instant federal habeas action on July 29, 2016 (ECF No. 1).

## II.  EXHAUSTION

Petitioner presents ten claims of ineffective assistance of trial counsel ("IATC") in his § 2254 petition (*see* ECF No. 1 at 14–35). Petitioner asserts he presented all ten of his claims to the state courts in his Rule 3.850 motion (*id.* at 5–12).

Respondent acknowledges that Petitioner presented ten IATC claims to the state court in his Third Amended Rule 3.850 motion, and that the claims in Petitioner's § 2254 petition are "undoubtedly similar" to the ones he presented to the state court (ECF No. 10 at 8, 24). However, Respondent contends Petitioner did not fairly present the federal nature of any of his IATC claims to the state courts (*id.* at 7–22). Respondent argues that Petitioner's citing the Sixth and Fourteenth Amendments to the Constitution in his Third Amended Rule 3.850 motion, without citing any Supreme Court or federal appellate court case dealing with his claims, was insufficient to satisfy the fair presentment requirement (*id.*). Respondent further argues that in Petitioner's initial brief in the post-conviction appeal, he only referenced his "Constitutional rights," and cited a couple of federal cases in discussing some of his

claims (including <u>United States v. Cronic</u>, 466 U.S. 648 (1984) and <u>Strickland v.</u>

<u>Washington</u>, 466 U.S. 668 (1984)), but none of the federal cases actually supported

his claims (*id.*).  Respondent contends all of Petitioner's claims are thus unexhausted

and procedurally defaulted (*id.*).

It is a long-standing prerequisite to the filing of a federal habeas corpus petition

that the petitioner have exhausted available state court remedies, 28 U.S.C.

§ 2254(b)(1),[2] thereby giving the State the "'opportunity to pass upon and correct'

alleged violations of its prisoners' federal rights." <u>Duncan v. Henry</u>, 513 U.S. 364,

365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting <u>Picard v. Connor</u>, 404 U.S.

270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the

exhaustion requirement, the petitioner must "fairly present" his claim in each

appropriate state court, alerting that court to the federal nature of the claim. <u>Duncan</u>,

---

[2] Section 2254 provides, in pertinent part:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted unless it appears that–
        (A)  the applicant has exhausted the remedies available in the courts of the
State; or
            (B) (i)  there is an absence of available State corrective process; or
                (ii)  circumstances exist that render such process ineffective to protect the
rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts
of the State, within the meaning of this section, if he has the right under the law of the State
to raise, by any available procedure, the question presented.

513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277. In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  In Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  *Id.* 459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39

(1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." Anderson, 459 U.S. at 7.  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim.  *Id.*, 459 U.S. at 7 and n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364.  The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[3]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim

---

[3] The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

that an evidentiary ruling at a state court trial denied him the due process of law

guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in

state court." Duncan, 513 U.S. at 365–66.

In Baldwin v. Reese, the Supreme Court again focused upon the requirement

of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present'

a claim to a state court if that court must read beyond a petition or a brief (or a similar

document) that does not alert it to the presence of a federal claim in order to find

material, such as a lower court opinion in the case, that does so." 541 U.S. 27, 32, 124

S. Ct. 1347, 158 L. Ed. 2d 64 (2004). The Baldwin Court commented that "a litigant

wishing to raise a federal issue can easily indicate the federal law basis for his claim

in a state-court petition or brief, for example, by citing in conjunction with the claim

the federal source of law on which he relies or a case deciding such a claim on federal

grounds, or by simply labeling the claim 'federal.'" Id., 541 U.S. at 32. With regard

to this statement, the Eleventh Circuit stated in McNair v. Campbell, 416 F.3d 1291

(11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor
> indeed for petitioners seeking to establish exhaustion. However, we
> agree with the district court that this language must be "applied with
> common sense and in light of the purpose underlying the exhaustion
> requirement[:] 'to afford the state courts a meaningful opportunity to
> consider allegations of legal error without interference from the federal

judiciary.'" <u>McNair</u> [v. Campbell], 315 F. Supp. 2d at 1184 (quoting <u>Vasquez v. Hillery</u>, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)).  This is consistent with settled law established by the Supreme Court. . . .  We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[4]

The state court record shows that Petitioner filed his Third Amended Rule 3.850 Motion on the model form provided in Rule 3.987 of the Florida Rules of Criminal Procedure (*see* Ex. D at 127–59).  The form instructed Petitioner as follows:

 Additional pages are not permitted except with respect to the facts that you rely upon to support your grounds for relief.  No citation of authorities need be furnished.  If briefs or arguments are submitted in support of your legal claims (as opposed to your factual claims) they should be submitted in the form of a separate memorandum of law.

(Ex. D at 127).  In the section of the form which instructed Petitioner to "state concisely every ground on which you claim that the judgment or sentence is unlawful," and to "summarize briefly the facts supporting each ground," Petitioner set

---

[4] In  his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law."  <u>McNair v. Campbell</u>, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments.  *Id.*

forth each of his ten IATC claims (*id.* at 134–55).  All of Petitioner's grounds for

relief referenced the denial of his right to effective assistance of counsel, and all but

two of them cited the Sixth and Fourteenth Amendments of the U.S. Constitution (*id.*).

In support of all of his grounds, Petitioner argued that defense counsel's performance

was deficient, and that counsel's performance prejudiced him such that there was a

reasonable probability the outcome of trial would have been different without

counsel's errors and omissions (*id.*).  In the state circuit court's order disposing of

Petitioner's Rule 3.850 motion, the court adjudicated the merits of each of Petitioner's

claims (*see* ECF No. 1 at 36–42).[5]  The state court construed all of Petitioner's IATC

claims as federal claims, applying the standard articulated by the Supreme Court in

<u>Strickland</u>, which is the applicable legal standard for IATC claims brought under the

Sixth Amendment.

---

[5] The state circuit court dismissed seven of Petitioner's claims as facially insufficient and denied the remaining three claims (*see* ECF No. 1 at 36–42).  The decision constituted a decision on the merits of each of Petitioner's claims.  *See* <u>Jones v. Sec'y, Fla. Dep't of Corr.</u>, 834 F.3d 1299, 1318 n.10 (11th Cir. 2016) (citing <u>Pope v. Sec'y for Dep't of Corr.</u>, 680 F.3d 1271 (11th Cir. 2012) ("[J]ust as under our federal procedural rules, a Florida state court's dismissal of a post-conviction claim for facial insufficiency constitutes—at least for purposes of the procedural default analysis—a ruling 'on the merits' that is not barred from our review.")).

Petitioner's references to federal law and the federal standard applicable to IATC claims was sufficient to alert the state court to the federal nature of his claims.[6] Therefore, the undersigned concludes Petitioner satisfied the fair presentation component of the exhaustion requirement.

## III.    FEDERAL REVIEW OF STATE COURT'S ADJUDICATION OF PETITIONER'S CLAIMS ON THE MERITS

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19. Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > **(1)**  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > **(2)**  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[6] The claims presented in Petitioner's § 2254 petition are not only "undoubtedly similar to," as Respondent puts it, the claims Petitioner presented in his Third Amended Rule 3.850 motion, they are a verbatim repetition of them (*see* ECF No. 1 at 14–35; ECF No. 10, Ex. D at 134–55). Respondent does not argue that Petitioner failed to present a cognizable federal claim in his § 2254 petition.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the <u>Williams</u> framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue.  <u>Thaler v. Haynes</u>, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); <u>Woods v. Donald</u>, — U.S. —, 135 S. Ct. 1372, 1376, 191 L.

Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."). Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. See Woods, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation

omitted)).  If the state court decision is contrary to clearly established federal law, the

federal habeas court must independently consider the merits of the petitioner's claim.

*See* Panetti v. Quarterman, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662

(2007).

If the "contrary to" clause is not satisfied, the federal habeas court next

determines whether the state court "unreasonably applied" the governing legal

principles set forth in the Supreme Court's cases.  The federal court defers to the state

court's reasoning unless the state court's application of the legal principle(s) was

"objectively unreasonable" in light of the record before the state court.  Williams, 529

U.S. at 409; *see* Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed.

2d 683 (2004) (per curiam).   In applying this standard, the Supreme Court has

emphasized:

> When reviewing state criminal convictions on collateral review, federal
> judges are required to afford state courts due respect by overturning their
> decisions only when there could be no reasonable dispute that they were
> wrong.  Federal habeas review thus exists as "a guard against extreme
> malfunctions in the state criminal justice systems, not a substitute for
> ordinary error correction through appeal."   Harrington, *supra*, at
> 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

Woods, 135 S. Ct. at 1376 (quoting Harrington v. Richter, 562 U.S. 86, 131 S. Ct.

770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See* Gill v. Mecusker, 633 F.3d 1272, 1292 (11th Cir. 2011).  As with the "unreasonable application" clause, the federal court applies an objective test.  Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.").  Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance."  Brumfield v. Cain, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct.  28 U.S.C. § 2254(e)(1).  The petitioner bears "the burden of rebutting the presumption of correctness by clear

and convincing evidence." *Id.*; *see, e.g.*, <u>Miller-El</u>, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").  Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications.  *See* <u>Cave v. Sec'y for Dep't of Corr.</u>, 638 F.3d. 739 (11th Cir. 2011).  However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision."  <u>Gill</u>, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied the AEDPA and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See* <u>Panetti</u>, 551 U.S. at 954.  Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).  "If this

standard is difficult to meet, that is because it was meant to be." Richter, 562 U.S. at 102.

Within this framework, the court will review Petitioner's claims.[7]

> A.    Ground One:  "Denial of Effective Assistance of Counsel.  Defense counsel conceded the defendant's guilt to a crime during opening and closing statements without the defendant's personal consent in the presence of the jury.  U.S. Constitution, Amendment VI, XIV."
>
> Ground Six: "Denial of effective assistance of counsel.  Defense counsel failed to question the police investigator and the victims in trial about the original description discrepancy of the suspect and failed to present description discrepancy to the jury for a reasonable defense.   U.S. Constitution, Amendment VI, XIV."

Both of these claims concern defense counsel's choice of trial strategy.  In Ground One, Petitioner alleges defense counsel, Attorney Pfeiffer, conceded his guilt to the lesser included offense of trespassing without Petitioner's consent (*see* ECF No. 1 at 5, 14–17).  Petitioner alleges on November 19, 2012, the day before his jury trial, Attorney Pfeiffer visited him at the jail and informed Petitioner that he (Pfeiffer) believed that the best trial strategy was to concede that Petitioner trespassed into the victims' hotel room, because Investigator Chris Henderson intended to testify that Petitioner admitted to the trespass (*id.*).  Petitioner alleges he told Attorney Pfeiffer that he did not admit to committing any crime, and he did not commit either a trespass

---

[7] The court has consolidated some of Petitioner's claims for organizational purposes.

or a burglary (*id.*).  Petitioner alleges during opening statements at trial, Attorney Pfeiffer admitted to the jury that the State had evidence (including DNA evidence and testimony of witnesses) that Petitioner entered the hotel room in question, but Pfeiffer argued that there was no evidence Petitioner intended to commit a crime in the hotel room; therefore, Petitioner was guilty of only trespassing (*id.*).  Petitioner alleges Attorney Pfeiffer also admitted Petitioner's guilt of trespassing in closing arguments (*id.*).  Petitioner alleges he did not consent to Pfeiffer's strategy of admitting that Petitioner was guilty of trespass (*id.*).  Petitioner contends Pfeiffer's conduct constituted ineffective assistance of counsel, in violation of the Sixth Amendment (*id.*).

In Ground Six, Petitioner alleges the victims initially described the intruder as a black male, approximately 6'5" tall, weighing 300 pounds, and wearing gray clothing and a towel over his head (ECF No. 1 at 26–27).  Petitioner alleges the victims' description changed nine days after the crime, when DNA evidence linked Petitioner to a pillowcase/hood discovered approximately one quarter mile from the crime scene (*id.*).  Petitioner alleges Attorney Pfeiffer was deficient for failing to cross-examine the victims about their varying physical descriptions, and for failing to cross-examine Investigator Henderson about the change in the victims' description

(*id.*).  Petitioner further contends Attorney Pfeiffer was deficient for failing to argue

to the jury that the victims' initial description of the intruder did not match Petitioner's

physical description, and that the victims' description changed to match Petitioner's

physical description after the results of the DNA testing were known (*id.*).

Respondent contends the state court's adjudications of Grounds One and Six

were not based upon an unreasonable determination of the facts, or contrary to or an

unreasonable application of clearly established federal law (ECF No. 10 at 33–41,

47–49).

### 1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set

forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  To obtain relief under

<u>Strickland</u>, Petitioner must show (1) deficient performance by counsel and (2) a

reasonable probability that, but for counsel's deficient performance, the result of the

proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a

showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

The focus of inquiry under the performance prong of <u>Strickland</u> is whether

counsel's assistance was reasonable considering all the circumstances and under

prevailing professional norms.  <u>Strickland</u>, 466 U.S. at 688–89, 691.  "The petitioner's

burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."   Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."   Strickland, 466 U.S. at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317).   Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" Id. (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do.'" Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15).  "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief

can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. *See* Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Jones v. GDCP Warden, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And Petitioner must show that the likelihood of a different result is substantial, not just conceivable. Williamson v. Fla. Dep't of Corr., 805 F.3d 1009, 1016 (11th Cir. 2015) (citing Richter, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncrasies of the particular decisionmaker,"

as the court should presume that the judge or jury acted according to law. *Id.* at 694–95. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), <u>Strickland</u> prejudice is gauged against the outcome of the trial, not on appeal. *See* <u>Purvis v. Crosby</u>, 451 F.3d 734, 739 (11th Cir. 2006) (citing <u>Strickland</u>, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. <u>Strickland</u>, 466 U.S. at 698; <u>Collier v. Turpin</u>, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult." <u>Richter</u>, 131 S. Ct. at 788. As the <u>Richter</u> Court explained:

> The standards created by <u>Strickland</u> and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question

is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Id.* (citations omitted).

> ## 2.   Federal Review of State Court Decision

Petitioner presented these claims as Grounds 1 and 6 in his Third Amended Rule 3.850 motion (Ex. D at 134–37, 146–47).   In the state circuit court's written decision denying the claims, the court correctly stated the deficient performance and prejudice prongs of the Strickland standard as the applicable legal standard (*see* ECF No. 1 at 38).   The court denied Ground 1 on the ground that Petitioner failed to show he was prejudiced by counsel's alleged error (*see id.*).   The court adjudicated Ground 6 as follows:

> In Ground 6, Defendant essentially claims that counsel was ineffective for conceding his guilt to the lesser-included offense of trespassing.   He alleges that counsel should have adopted a strategy based on the discrepancies in the description of the suspect given by the victims.   He also alleges that, if counsel had adopted such a strategy, then he would have been acquitted.
>
> The Court finds that Defendant has not demonstrated that counsel's performance was deficient or that he was prejudiced.   At the limited evidentiary hearing, counsel testified that, based on the evidence, he believed the best trial strategy would be to admit that Defendant was in the hotel room but argue that Defendant did not intend to commit a crime therein.[FN 10]   Based on the evidence presented by the State . . . specifically Defendant's statement to the investigator that the incident was a joke that had gone bad,[FN 11] the Court finds that counsel's

tactical decision to concede guilt to the lesser-included offense of trespassing was reasonable. *See Harris v. State*, 768 So. 2d 1179, 1182–83 (Fla. [4th DCA 2000]).  The Court therefore concludes that Ground 6 should be denied.

> [FN 10:  Limited Evidentiary Hearing Transcript, pp. 31–34, 42–43.]

> [FN 11:  Exhibit D, Trial Transcript, pp. 188–89, 195–97.]

(ECF No. 1 at 41).  The First DCA affirmed the decision without written opinion (Ex. H).

In <u>Florida v. Nixon</u>, 543 U.S. 175, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004), the Supreme Court made clear that an attorney does not have the authority, without explicit consent, to enter a guilty plea on behalf of a client, but that counsel's concession of some level of guilt at trial is not the functional equivalent of a guilty plea.  543 U.S. at 187–88.  The Court explained that despite the concession of guilt made by Nixon's counsel, Nixon retained the rights accorded a defendant in a criminal trial, including the right to have the state prove every element of the offense beyond a reasonable doubt.  *Id.* at 188.  The Court also explained that a concession of guilt was not presumed to be deficient performance, and under <u>Strickland</u>, the defendant still must prove "counsel's concession trial strategy was unreasonable."  *Id.* at 189. The Court in <u>Nixon</u> found in that case that ineffective assistance had not been shown.

Although <u>Nixon</u> was a capital case, the principles set forth still apply in the non-capital context.

The factual context of Petitioner's IATC claims are found in the transcript of Petitioner's trial, which was part of the record in the state post-conviction proceeding (as evidenced by the circuit's court's reference to portions of it in its order denying Petitioner's Rule 3.850 motion).

In Attorney Pfeiffer's opening statement, he argued that Petitioner was "possibly" guilty of trespass (Ex. L at 94–98).

Sean Meyer, one of the victims, testified that he, his wife Kirsten, and his five-year-old son Martin stayed at the Quality Inn hotel a/k/a/ Bay Beach Inn, in Gulf Breeze, Florida on January 21 and 22 of 2012 (Ex. L at 98–100). Mr. Meyer testified that their room was on the second floor facing the water, and it had a balcony with a glass door, which "opened like a normal door with hinges" (*id.* at 101). Mr. Meyer testified that the door did not have a screen (*id.*). Mr. Meyer testified that when the family went to bed, they left the balcony door propped open at least 45 degrees, with a fold-down door stop (*id.* at 102). Mr. Meyer testified that there were several items on the balcony, including two chairs from the hotel, and the family's wet bathing suits, beach towels, and sandals (*id.*). He testified that some of the items were hanging on

the railing of the balcony, and other items were on the chairs (*id.* at 103). Mr. Meyer testified there were no stairs leading to the balcony or any other way to access the balcony from the ground (*id.*). Meyer testified that his son was sleeping in the bed closest to the balcony, and he and his wife were sleeping in the other bed, which was closest to the front door of the room (*id.* at 105–07). Mr. Meyer testified that at approximately 3:00 in the early morning of January 23, he had used the bathroom and went back to bed facing the balcony (*id.* at 107, 112). He testified that he had not fallen back to sleep, and heard a bit of noise on the balcony, so he lifted his head and looked (*id.*). Mr. Meyer testified that he saw an individual looking into the room and moving through the threshold of the balcony door into the room (*id.* at 107–08). Mr. Meyer testified that he immediately got out of bed, yelled at the intruder to leave, moved toward the person, and attempted to push him out of the room through the balcony door (*id.*). Mr. Meyer testified that the intruder was approximately his own weight and height, had very dark skin, and was wearing something white draped over his head and down to his shoulders on both sides (*id.* at 108–09). Meyer testified that the intruder's face was visible, but the rest of his head was covered (*id.* at 109). Mr. Meyer testified that his wife and son were screaming (*id.* at 110). Meyer testified that he and his wife pushed the intruder back through the door and onto the balcony, and

then the intruder went over the balcony (*id.*).  Mr. Meyer testified that he looked over the balcony railing and saw the intruder lying motionless face down (*id.* at 111). Meyer testified that the intruder's head was no longer covered, and he could see very dark skin and a close-shaven head (*id.*).  Mr. Meyer testified that he grabbed all of the items off the balcony, went inside the room, and locked the door (*id.*).  Mr. Meyer testified that he saw sandy footprints from the intruder "a good distance into the room" (*id.* at 115–16). He testified that his wife called 911 (*id.*).  Mr. Meyer testified that he suffered large scrapes on his back as a result of pushing the intruder through the balcony door (*id.* at 114).  He testified that the intruder did not take anything from the room (*id.* at 113).  On cross-examination, Mr. Meyer testified that his own height was approximately 5'8" (*id.* at 120).

Kristen Meyer's trial testimony was generally consistent with her husband's (Ex. L at 123–38).  She testified that during the early morning hours of January 23, 2012, she heard a thud that woke her up (*id.* at 129).  Mrs. Meyer testified that she saw her husband engaged in a struggle with another man (*id.* at 129–30).  Mrs. Meyer testified that the struggle occurred past her son's bed, which was closer to the balcony, and at the foot of the bed in which she and her husband were sleeping, which was the bed that was further from the balcony and closer to the front door of the hotel room

(*id.* at 130).  Mrs. Meyer testified that the intruder had dark skin and short dark hair, was dressed in dark gray clothing, and had something white covering the top of his head (*id.* at 130–31).  Mrs. Meyer testified that she got out of bed and helped her husband push the intruder out of the room and onto the balcony, and the intruder "went back over the balcony" (*id.* at 131).  Mrs. Meyer testified that the intruder landed flat on the ground, and at that point she saw that he had short, dark hair (*id.*). Mrs. Meyer testified that she went back into the room and called 911 (*id.*).  Mrs. Meyer testified that police responded while she was still on the phone (*id.* at 132). Mrs. Meyer testified that after the intruder left the room, she saw sandy footprints in the room (*id.* at 133).  She testified that the only items of value in the room were two iPhones and an iPad, which were near the foot of the bed where the struggle occurred, and her jewelry, which was in the bathroom (*id.* at 132, 136).  Mrs. Meyer testified that the intruder did not take any items from the room (*id.* at 132).  Mrs. Meyer testified that she suffered a bruise on her left arm as a result of the incident (*id.* at 133). On cross-examination, Mrs. Meyer testified that during the 911 call, she described the intruder as 6'5" tall and weighing 300 pounds, but she later realized that her description was not accurate due to her perspective of lying down at the time she made the observation (*id.* at 137, 142).

John Couch, Jr., testified that at approximately 11:00 p.m. on January 22, 2012, he gave Petitioner a ride from Janet's Mustang Bar near Midway on Highway 98 in Gulf Breeze, to Pensacola, and then back to Gulf Breeze (Ex. L at 149–52). Mr. Couch testified that he dropped Petitioner off at the Bay Beach Inn in Gulf Breeze at approximately midnight (*id.* at 152).

Deputy John Zabelle testified he was a canine handler with the Santa Rosa County Sheriff's Office at the time of the burglary (Ex. L at 154–55). Zabelle testified he was dispatched to the hotel, and upon his arrival, other officers informed him that the suspect had come off the balcony and then ran (*id.* at 158). Deputy Zabelle testified he went to the area below the balcony where the suspect was last seen, and then brought his canine to the spot (*id.*). Zabelle testified the canine began to track to the east end of the 3-Mile Bridge, along the seawall toward the foot of the bridge (*id.* at 158–59). Deputy Zabelle testified that a Gulf Breeze police officer accompanied him during the canine track (*id.* at 159). Zabelle testified that the canine tracked to a white pillowcase and a large white towel with a "Choice Hotels International" label, and the items were collected (*id.* at 159, 180–81). The large white towel was admitted into evidence as Exhibit 7 (*see* Ex. L at 180–81; Ex. A at 87). The pillowcase was admitted into evidence as Exhibit 8 (*see* Ex. L at 181–82; Ex. A at 87).

Jason Denney testified he was an officer with the Gulf Breeze Police Department (Ex. L at 161). Denney testified that he was the officer who accompanied Deputy Zabelle during the canine track (*id.* at 161–64). Officer Denney testified that upon discovering the pillowcase and towel, he placed gloves on his hands and collected the items (*id.* at 163–64). Officer Denney testified that he observed two holes burned into the pillowcase, which were approximately the diameter of a person's eyes and spaced approximately the width of a person's eyes (*id.* at 164–65). Denney testified that he also observed blood on the pillowcase (*id.* at 165). Officer Denney testified he turned the evidence over to Officer Stevens (*id.* at 165–66).

Mitchell Stevens, an officer with the Gulf Breeze Police Department, testified that he collected items of evidence from Officer Denney (Ex. L at 169–71). Stevens testified he placed each of the items in a separate bag and placed the bags in his trunk (*id.* at 171). He testified he returned to the police station and turned the items over to Sergeant Lyster (*id.* at 171–72).

Sergeant Mark Lyster testified he received the items of evidence and turned them over to Investigator Henderson (Ex. L at 173–75).

Investigator Chris Henderson testified that he responded to the Quality Inn/Bay Beach Inn shortly after the burglary (Ex. L at 176–78). Henderson testified he

photographed the balcony and the area of ground just below the balcony (*id.* at 178–79). Investigator Henderson testified that he made a cast of a shoe print found on the beach near the foot of the Three Mile Bridge (*id.* at 178–79, 183–84). He testified that in addition to the large towel and pillowcase discovered by the officers during the canine track, two small "hand or wash" towels were discovered near the hotel buildings (*id.* at 179, 181). The small towels were admitted into evidence as Exhibits 7A and 7B (Ex. L at 181; Ex. A at 87). Investigator Henderson testified he submitted the shoe print cast and the pillowcase to the Florida Department of Law Enforcement's ("FDLE") crime lab (*id.* at 179–84, 196).

Investigator Henderson testified that he developed Petitioner as a suspect in the burglary (Ex. L at 185). Henderson testified that he knew Petitioner as an acquaintance at a local bar (*id.* at 185–86). Henderson testified that the local television station broadcast a news story about the burglary, and Henderson told the TV station that Petitioner was a person of interest (*id.* at 186). Investigator Henderson testified that the broadcast included a picture of Petitioner (*id.*). Henderson testified that Petitioner contacted him on February 9, 2012, after the broadcast aired, and provided his date of birth and social security number (*id.*). Henderson testified that Petitioner asked why his photo was on the local news, and Henderson responded that

Petitioner was a suspect in the hotel burglary (*id.* at 187). Investigator Henderson testified that Petitioner initially denied that he was at the hotel that night, and said he was at the Mustang Bar in Gulf Breeze (*id.* at 187–88). Henderson testified that Petitioner subsequently contacted him several times, and after Henderson described some of the evidence he had gathered, Petitioner admitted that he was at the hotel, and described the incident as "a joke that had gone bad" (*id.* at 188–89, 194). Investigator Henderson testified that Petitioner told him that he went to the hotel to meet some acquaintances, and when he got there, he decided to scare them (*id.* at 188). Henderson testified that Petitioner stated he climbed up onto the second floor balcony and entered the hotel room, and then realized that it was not the correct room (*id.*). Investigator Henderson testified that he asked Petitioner about the holes burned in the pillowcase, and Petitioner stated that he used a cigarette lighter to make holes in the pillowcase, which he intended to use to scare the acquaintances in the hotel room (*id.*). Henderson asked Petitioner the names of his acquaintances, but Petitioner could provide only a first name and said it was a woman with red hair (*id.* at 189, 194–95). Henderson testified he asked Petitioner to try to provide the woman's last name, but Petitioner said the woman was out of the country (*id.*). Investigator Henderson testified that Petitioner asked what the criminal charges were, and Henderson

responded that the charges were burglary and battery (*id.* at 189). Henderson testified that Petitioner responded that the male victim had battered him (Petitioner) when Petitioner was standing in the room (*id.* at 189, 195). Petitioner stated he tried to get away but was tackled by the victims, causing him to fall over the balcony onto the ground and injure himself (*id.*).

Investigator Henderson identified a pair of tennis shoes that he collected from Petitioner after Petitioner was arrested and detained at the jail (Ex. L at 190). Henderson testified he also collected buccal swabs from Petitioner, and submitted the evidence to FDLE (*id.* at 191–92). Investigator Henderson testified that Petitioner's shoes and the shoe print both had the impression "Jordan" (*id.* at 194).

Diana Kabus, a crime lab analyst with FDLE, testified that she examined the cast of the shoe impression made at the scene and determined that there was sufficient detail for her to make a comparison (Ex. L at 199–200, Ex. M at 202–04). Ms. Kabus testified that she compared the impression with the pair of shoes provided by Investigator Henderson, and determined that, based upon the tread design, physical size, shape, and condition, the left shoe could have made the impression (Ex. M at 204–06).

Jennifer Kay, a crime lab analyst in the biology section of the FDLE, testified that she examined the pillowcase provided by Investigator Henderson (Ex. M at 218–29). Ms. Kay testified that she cut a portion of the pillowcase where there appeared to be blood and developed a full, complete DNA profile (*id.* at 229). Ms. Kay testified that she compared the DNA profile with the DNA profile of Petitioner's buccal swab and determined that the DNA profiles matched (*id.* at 230–32). Ms. Kay testified regarding the statistical population frequency of the DNA match (*id.* at 232). She testified, "[I]f you went out and grabbed a random person off the street, the chances that they would have that exact same profile . . . is 1 in 24 Quintilian [sic]" (*id.*). Ms. Kay testified that the number is equal to one million times the Earth's population (*id.* at 233).

In closing argument, Attorney Pfeiffer argued that there were not many facts in dispute, but the question for the jury was whether the facts satisfied the elements of burglary (Ex. M at 246–54). Pfeiffer argued that there was no dispute that Petitioner was in the hotel room on the night of the crime, but the evidence failed to prove that Petitioner intended to commit a crime when he entered the room (*id.*). Pfeiffer argued that the evidence was consistent with only the crime of trespass, and that Petitioner should be found guilty of only that offense (*id.*).

This is not a case where defense counsel conceded Petitioner's guilt to the offense charged in the information.  Petitioner was charged with burglary of an occupied dwelling while wearing a mask or hood.  Petitioner alleges only, and the record confirms, that Attorney Pfeiffer conceded only that Petitioner was guilty of trespass.  Therefore, defense counsel's concession did not amount to a guilty plea, and Petitioner's consent to the strategy was not required. *See* <u>McNeal v. Wainwright</u>, 722 F.2d 674, 676–77 (11th Cir. 1984).

The next question is whether Attorney Pfeiffer's trial strategy was reasonable. Pfeiffer testified at the post-conviction evidentiary hearing that he developed a trial strategy based upon the evidence he expected the State to introduce (Ex. F at 29–34). Attorney Pfeiffer testified that he deposed Investigator Henderson and thus was aware of Petitioner's admission to Henderson he had entered the hotel room (*id.* at 31–33). Pfeiffer testified he was also aware of the DNA evidence (*id.* at 33).  Attorney Pfeiffer testified that he was aware that there was a discrepancy between Mr. and Mrs. Meyer's physical descriptions of the intruder, but given the DNA evidence and Petitioner's admission that he was in the room, he believed that the better defense strategy was to focus on the intent element of the burglary and argue for the lesser included offense of trespass, as opposed to trying to convince the jury that Petitioner

was not in the hotel room (*id.* at 33–40, 42).  Attorney Pfeiffer testified that he discussed this strategy with Petitioner prior to trial, and although Petitioner didn't like it, Pfeiffer explained why he was going with the trespass theory and that he thought it was the best option (*id.* at 33–34).

Attorney Pfeiffer's trial strategy was reasonable.  Attorney Pfeiffer knew that Petitioner had admitted to Investigator Henderson that he entered the victims' hotel room without their consent, and Pfeiffer knew that Petitioner's admission was admissible at trial.  Pfeiffer also knew that DNA evidence linked Petitioner to the bloody pillowcase found during the canine track from where the intruder fell of the balcony to the foot of the bridge where the pillowcase was found.  Attorney Pfeiffer's strategy was to cast doubt on the State's evidence that Petitioner entered the hotel room with the intent to commit a crime therein.  The State's evidence with respect to intent was purely circumstantial, primarily that there were valuables in the room, and Attorney Pfeiffer attempted to cast doubt on the State's case with respect to intent by emphasizing that Petitioner explained to Investigator Henderson that he intended to play a joke on friends but mistakenly entered the wrong room.  Attorney Pfeiffer's strategic decision to pursue a defense of conceding Petitioner's unauthorized entry into the hotel room but arguing there was insufficient evidence to prove that Petitioner

intended to commit a crime therein, instead of pursuing a defense of misidentification, was reasonable.

Petitioner failed to demonstrate that the state court's adjudication of Ground One or Ground Six was contrary to or an unreasonable application of <u>Strickland</u>. *See. e.g.*, <u>Solis v. Sec'y, Fla. Dep't of Corr.</u>, — F. App'x —, 2018 WL 1129603, at *2 (11th Cir. Mar. 1, 2018) (unpublished but recognized as persuasive authority) (state court could have reasonably determined that trial counsel, faced with victim's positive identification and biological evidence connecting petitioner to crimes of burglary with assault and sexual battery, made strategic decision to concede that petitioner was guilty of assault and to focus on State's failure to produce direct evidence that petitioner had burgled the victim's vehicle). Petitioner is not entitled to federal habeas relief on Ground One or Ground Six.

B.    <u>Ground Two: "Denial of Effective Assistance of Counsel. Defense counsel failed to seek defendant's personal appearance regarding critical proceeding, speedy trial calendar call and an opportunity to cancel or proceed with the speedy trial demand. U.S. Constitution, Amendment VI, XIV."</u>

Petitioner alleges Attorney Pfeiffer erred at a "calendar call" proceeding on October 11, 2012, by failing to seek Petitioner's appearance at the proceeding or to request a continuance to enable Petitioner to appear and participate (*see* ECF No. 1 at 6, 18–19). Petitioner alleges the decision of whether to proceed with a demand for

speedy trial is strictly the defendant's decision, and at no time did he authorize Attorney Pfeiffer to make any decisions concerning his speedy trial rights (*id.*). Petitioner alleges he did not waive his personal appearance at the October 11 "calendar call" (*id.*). He alleges Attorney Pfeiffer's proceeding without him violated Rule 3.180 of the Florida Rules of Criminal Procedure (*id.*). Petitioner alleges Attorney Pfeiffer knew that the State intended to amend the information in a manner that increased Petitioner's maximum sentence exposure from 15 to 30 years (by charging him under Florida Statute § 775.0845, which reclassified his offense from a second degree felony to a first degree felony based upon his wearing a hood during the burglary to conceal his identity) (*id.*). Petitioner alleges if he had been present at the October 11 "calendar call," he would have instructed Attorney Pfeiffer to withdraw the demand for speedy trial to enable the defense to conduct further investigation on the "amended charges" (*id.*). Petitioner alleges he would not have been found guilty of any wrongdoing if he had more time to prepare a stronger defense (*id.*).

Respondent contends the state court's adjudication of Ground Two was not based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of clearly established federal law (ECF No. 10 at 41–42).

      1.      Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

      2.      Federal Review of State Court Decision

Petitioner presented this claim as Ground 2 in his Third Amended Rule 3.850

motion (Ex. D at 138–39).  The state circuit court adjudicated the claim as follows:

> In Ground 2, Defendant claims that counsel was ineffective for
> failing to secure his presence at the calendar call held on October 11,
> 2012.  He alleges the following.  He did not waive his presence at the
> hearing, and he did not authorize counsel to make any decisions
> regarding speedy trial.  His absence prejudiced the defense because the
> State intended to file the second amended information.  If he had been
> present at the calendar call and informed of the State's intent, he would
> have withdrawn his demand for speedy trial.  The defense would have
> then had more time to investigate, conduct depositions, and prepare a
> reasonable defense on the new charge in the third amended information,
> and he would have been acquitted.
>
> The Court finds that Defendant's allegations are conclusory and
> refuted by the record.  Counsel filed the demand for speedy trial on
> October 8, 2012.[FN 6] The calendar call was held three days later on
> October 11, 2012.[FN 7]  *See* Fla. R. Crim. P. 3.19l(b)(l).  At the
> calendar call, no matters were discussed that required Defendant's input
> and no adverse rulings were made against him.  *See Wike v. State*, 813
> So. 2d 12, 20–21 (Fla. 2002).  Counsel expressed his desire to have
> Defendant present, but it was discovered that Defendant had not been
> transported from the jail.  Counsel did not make any new decisions
> regarding speedy trial.  The only matter discussed was that the case
> needed to be set for trial and that the parties had picked November 20,
> 2012, as the trial date.  *See* Fla. R. Crim. P. 3.19l(b)(2).  The State did
> not announce its intent to file the second amended information, which

notably was not filed until November 19, 2012.[FN 8]  The Court therefore concludes that Ground 2 should be denied.

> [FN 6:  Exhibit H, Demand for Speedy Trial.]

> [FN 7:  Exhibit I, Calendar Call Transcript.]

> [FN 8:  Exhibit C, Second Amended Information.]

(ECF No. 1 at 39–40).  The First DCA affirmed the decision without written opinion (Ex. H).

The state record confirms that on September 27, 2012, the State filed a Second Amended Information charging Petitioner with the following two counts:  (1) burglary of an occupied dwelling (i.e., unlawfully entering room #260 of the Bay Beach Inn or Quality Inn with the intent to commit a theft), a second degree felony, and (2) wearing a mask or hood on the property of another, a second degree misdemeanor (Ex. E at 230–31).

On October 8, 2012, Attorney Pfeiffer filed a demand for speedy trial, demanding a trial within sixty days (Ex. E at 278).

The transcript of the October 11, 2012, proceeding shows that Petitioner was not transferred for the "calendar call" due to a misunderstanding with the transportation department of the local jail (Ex. E at 280–89).  Attorney Pfeiffer indicated his desire that Petitioner be present for the proceeding, but the court

proceeded without Petitioner and set a trial date for November 20, 2012, which was within forty-five days of the date the demand for speedy trial was filed (*id.*).  The court inquired of counsel whether 30 jurors would be a sufficient number, and counsel responded that it would, since Petitioner was charged with a second degree felony (*id.* at 282).  During the proceeding, the prosecutor gave no indication that he intended to amend the information (*see id.* at 280–89).

On November 19, 2012, the day prior to Petitioner's trial, the State filed a Third Amended Information charging Petitioner with burglary of an occupied dwelling while wearing a mask, a first degree felony (Ex. E at 233).  The factual basis for the charge remained the same, i.e., that Petitioner unlawfully entered room #260 of the Bay Beach Inn or Quality Inn with the intent to commit a crime therein; but the prosecutor included assault, battery, and theft as alternative crimes that Petitioner intended to commit in the room, whereas the previous information listed only theft (*id.*).

The state court could have reasonably concluded that Petitioner failed to demonstrate that Attorney Pfeiffer's failure to insist on Petitioner's presence at the calendar call was deficient.  Rule 3.180 of the Florida Rules of Criminal Procedure requires the presence of the defendant at "any pretrial conference."  *See* Fla. R. Crim.

P. 3.180(a)(3).   But Florida courts have held that a defendant's presence at proceedings in the nature of the calendar call at issue in this case is not required.  *See* Cotton v State, 764 So. 2d 2, 3 (Fla. 4th DCA 1998) (neither the calendar call at which defense counsel advised court that he was not ready for trial because he had been unable to depose medical examiner, nor subsequent hearing on defense counsel's oral motion for continuance because he had still been unable to depose examiner, qualified as "pretrial conferences," within meaning of Rule of Criminal Procedure providing that defendant shall be present at any pretrial conference); Junco v. State, 510 So. 2d 909, 911–12 (Fla. 3d DCA 1987) (defendants had no right to be present at pretrial conference which dealt with legal and administrative matters not needing defendants' input or influence).  Furthermore, the calendar call did not qualify as a critical stage of the proceedings at which Petitioner's presence was constitutionally required.  *See* United States v. McChesney, 871 F.3d 801, 808–09 (9th Cir. 2017) (two pre-hearing conferences were not critical stage proceedings that defendant had a constitutional right to attend where conferences dealt with preliminary scheduling and procedural issues related to evidentiary hearing and were of administrative nature where defendant's presence was not required); United States v. Benford, 574 F.3d 1228, 1232–33 (9th Cir. 2009) (defendant's pretrial status conference, which confirmed the

pre-existing trial date, was not a "critical stage"); United State v. Barth, 424 F.3d 752,

762–63 (8th Cir. 2005) (rejecting defendants' argument that their absence at a pretrial

proceeding, which included discussion of "the amount of time required for opening

statements and the daily trial schedule," violated their constitutional and statutory

right to be present during every critical stage of their trial).

Additionally, the state court could have reasonably concluded that Petitioner

failed to demonstrate he was prejudiced by Attorney Pfeiffer's failure to obtain

Petitioner's appearance at the calendar call on October 11.  Petitioner alleges if he had

been present at the October 11 proceeding, he would have instructed Attorney Pfeiffer

to withdraw the demand for speedy trial to enable the defense to conduct further

investigation on the "amended charges" and prepare a "strong, more reasonable"

defense.  But Petitioner failed to show that additional time to investigate would have

led to any evidence helpful to the defense.  As previously discussed, Petitioner

admitted to Investigator Henderson that he entered the Meyers' hotel room without

their consent, and DNA evidence linked Petitioner to the bloody pillowcase/hood with

eye holes which was discovered during the canine track of the intruder's scent.

Petitioner's only reasonable defense strategy was to argue that there was insufficient

evidence that he intended to commit a crime in the Meyers' room when he entered it,

and that is the strategy pursued by Attorney Pfeiffer.  Petitioner failed to show that State's amending the information to include assault and battery in the list of alternative crimes that Petitioner intended to commit required a modification of the defense strategy or more time to investigate.

The state court's factual findings are supported by the record, and the court reasonably concluded that Petitioner failed to demonstrate ineffective assistance of defense counsel based upon counsel's failure to insist on Petitioner's appearance at the "calendar call" on October 11, 2012.  Therefore, Petitioner is not entitled to relief on Ground 2.

C.    Ground Three:  "Denial of Effective Assistance of Counsel.  Defense counsel failed to seek Defendant's personal presence at a motion hearing and failed to inform the Defendant that the motion hearing took place, which violated the defendant's Constitutional Rights.  U.S. Constitution, Amendment VI, XIV."

Ground Four:  "Denial of Effective Assistance of Counsel.  Defense counsel failed to investigate evidence and remove other evidence not linked or used in this crime at motion hearing.  U.S. Constitution, Amendment VI, XIV."

Petitioner alleges on the morning of trial, Attorney Pfeiffer made a motion in limine to exclude evidence of a remote control that was discovered on the beach by police (*see* ECF No. 1 at 8, 20–21).  Petitioner alleges Pfeiffer sought to exclude the

remote control, because there was no evidence linking the remote control to the burglary of the Meyers' hotel room (*id.*).

In Ground Three, Petitioner alleges he was not in the courtroom for the hearing on the motion in limine, and he contends Attorney Pfeiffer was ineffective for proceeding without his presence (ECF No. 1 at 8, 20–21). Petitioner contends Fla. R. Crim. P. 3.180(a)(6) required his presence "when evidence is addressed to the court out of the presence of the jury for the purpose of laying the foundation for the introduction of evidence before the jury" (*id.*). Petitioner argues that if he had been present, he would have asked Attorney Pfeiffer why he was not seeking to exclude the other items discovered during the canine search, on the same ground, i.e., that there was no evidence linking the items to the crime (*id.*). Petitioner alleges he also would have asked Attorney Pfeiffer why forensic testing was not performed on all of the items (*id.*). Petitioner alleges there is a reasonable probability the outcome of trial would have been different it Attorney Pfeiffer had ensured Petitioner's presence at the hearing on the motion in limine (*id.*).

In Ground Four, Petitioner contends Attorney Pfeiffer was ineffective for failing to include other evidence in the motion in limine, instead of only the remote control (*see* ECF No. 1 at 10, 22–23). Petitioner argues Pfeiffer should have also

sought to exclude the large towel, pillowcase/hood, and small towel discovered with the remote control near a public fishing/boat dock, as well as the other small towel discovered in a different location closer to the crime scene (*id.*).  Petitioner contends the pillowcase linked him only to the fishing/boat dock, but not to the burglary, and there was no evidence linking any of the other items to the burglary (*id.*).  Petitioner also contends Attorney Pfeiffer was ineffective for failing to obtain DNA testing of the towels (*id.*).  Petitioner contends there is a reasonable probability the result of trial would have been different if Attorney Pfeiffer had obtained DNA testing of the towels and requested exclusion of evidence of the towels and the bloody pillowcase/hood (*id.*).

Respondent contends the state court's adjudications of Grounds Three and Four were not based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of clearly established federal law (ECF No. 10 at 42–45).

> 1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

> 2.    Federal Review of State Court Decision

Petitioner presented these IATC claims as Grounds 3 and 4 in his Third Amended Rule 3.850 motion (Ex. D at 140–41).  The state circuit court denied

Ground 3 on the ground that Petitioner failed to sufficiently allege he was prejudiced by counsel's alleged error (in not securing Petitioner's presence when the court heard the motion in limine) (ECF No. 1 at 39). The court adjudicated Ground Four as follows:

> In Ground 4, Defendant claims that counsel was ineffective for failing to file a motion in limine to exclude the pillowcase from evidence. He alleges that the pillowcase was not linked to the crime. He also alleges that, if the pillowcase would have been excluded from evidence, then he would have been acquitted.
>
> The Court finds that Defendant's allegations are refuted by the record. Even if counsel had moved to exclude the pillowcase, the Court would have denied the motion as the pillowcase was relevant to the crime charged. At trial, the State presented evidence that the pillowcase was found along the path tracked by the K-9 dog from the balcony of the hotel, that there was blood on the pillowcase that appeared to be fresh, that the blood matched Defendant's DNA profile, that there were holes cut or burned in the pillowcase, and that Defendant told the investigator that the incident was a joke that had gone bad and that he had used a cigarette lighter to make holes in the pillowcase.[FN 9] The Court therefore concludes that Ground 4 should be denied in part.
>
> > [FN 9: Exhibit D, Trial Transcript Excerpts, pp. 157–59, 161–65, 169–71, 181–90, 195–97, 231–32.]
>
> Defendant also claims that counsel was ineffective for not investigating the white towels found with the pillowcase and having the towels tested for DNA. He alleges that, if counsel had done so, it is possible that a different suspect would have been identified and the outcome of the trial would have been very different.

The Court finds that Defendant's claim is facially insufficient. The claim is purely speculative conclusory, and Defendant fails to allege proper prejudice. *See Jones* [*v.  State*], 998 So. 2d [573,] 584 [(Fla. 2008)].  Because Defendant has been given the opportunity to amend and these claims are still facially insufficient, the Court concludes that Ground 4 should be dismissed with prejudice in part. *See* Fla. R. Crim. P. 3.850(f)(2); *Nelson* [*v. State*], 977 So. 2d [710,] 711–12 [(Fla. 1st DCA 2008)]; *Oquendo* [*v. State*], 2 So. 3d [1001,] 1006 [(Fla. 4th DCA 2008)].

(ECF No. 1 at 40–41).  The First DCA affirmed the decision without written opinion (Ex. H).

The trial transcript shows that on the morning of trial, Attorney Pfeiffer made a motion in limine to exclude evidence of a remote control discovered with the pillowcase/hood during the canine track (Ex. L at 10).  The entirety of the hearing was the following:

> MR. PFEIFFER: He [Petitioner] allegedly broke into a hotel room in the middle of the night and the police were called, the dogs came out. A hundred yards or something down the beach, they found a towel and a sheet with holes burned into the eyes and a remote control. I guess the inference being the remote control came from the hotel but nobody ever verified that.  The Detective said, he checked and nobody ever got back with them so there's no evidence that remote control has to do with anything.  There's no fingerprints on it that I know of.

> MR. PARKER [the prosecutor]:  However, it was where the dog tracked to in the area where the other items that are associated with him. I mean, you can certainly on cross and ask him, you know, was it ever connected to any room or did you ever verify whether it was taken from

the victim's room or anything like that.  And I think you can resolve it
by asking questions about that so . . .

THE COURT:  Let me ask a question, because nobody's ever
verified where the remote came from them?

MR. PARKER:  Correct.

THE COURT:  Okay.

MR. PARKER:  And their remote was not missing from their room.

THE COURT:  And my reason why I'm saying that is because
would that not possibly—remote possibility—but thinking how jurors
think, possibly remotely infer that there may have been a different
burglary because jurors think like that.  Y'all know they do.

MR. PARKER:  Yeah.

THE COURT:  So I'm gonna grant the motion in limine on the
remote control.

(Ex. L at 10–11).

The state court reasonably concluded that Petitioner failed to show he was

prejudiced by Attorney Pfeiffer's failure to ensure Petitioner's attendance at the

hearing on the motion in limine, Pfeiffer's failure to include the pillowcase/hood and

towels in the motion in limine, or Pfeiffer's failure to obtain DNA testing of the

towels.

Even if Petitioner's presence at the motion in limine hearing was required under Rule 3.180(a) of the Florida Rules of Criminal Procedure, Petitioner suffered no prejudice, because the trial court ruled in favor of the defense. *See* <u>Smithers v. State</u>, 826 So. 2d 916, 927 (Fla. 2002) (any violation of Rule 3.180(a) is subject to harmless error analysis, and the proceeding would be reversed only if fundamental fairness had been thwarted) (internal quotation marks and citation omitted).

Additionally, Attorney Pfeiffer could not have successfully argued for exclusion of the bloody pillowcase/hood discovered with the remote control. Petitioner contends Attorney Pfeiffer should have argued for exclusion of the pillowcase on the ground that there was no evidence linking it to the burglary. And Petitioner states he would have told Attorney Pfeiffer to include the pillowcase in the motion in limine if Petitioner had been present at the hearing on the motion. There was no reasonable probability the trial court would have properly granted a motion in limine with respect to the pillowcase/hood. The canine track led law enforcement from the location where the burglar fell of the Meyers' balcony to the location of the pillowcase. DNA testing linked Petitioner to the bloody pillowcase/hood. And Petitioner admitted to Investigator Henderson that he burned eye holes in the pillowcase, and that he did so with the intent to scare his friends when he entered the

hotel room.  The pillowcase tended to prove that Petitioner was the burglar; therefore, it was relevant and admissible.  *See* Fla. Stat. § 90.401 (defining relevant evidence as evidence tending to prove or disprove a material fact); Fla. Stat. § 90.4012 (stating that all relevant evidence is admissible, except at provided by law).

The same is true with respect to the large towel discovered with the bloody pillowcase/hood and the remote control.  Petitioner contends Attorney Pfeiffer should have argued for exclusion of the large towel, on the ground that there was no evidence linking it to the burglary.  But the victims, Mr. and Mrs. Meyers, testified that the burglar wore something white draped over his head during the burglary.  Evidence of the large towel found with the pillowcase/hood containing Petitioner's DNA tended to prove that Petitioner was the burglar who entered the hotel room with something white draped over his head.  Therefore, there is no reasonable probability the trial court would have properly granted a motion in limine with respect to evidence of the large towel.

With respect to the two small towels, there is no reasonable probability the jury would have rendered a different verdict if evidence of the small towels had been excluded.  In light of Petitioner's admission to Investigator Henderson that he was the intruder who entered the hotel room through the second floor balcony, as well as the

DNA evidence linking Petitioner to the bloody pillowcase, which Petitioner admitted

he turned into a hood by burning eye holes in it to scare his friends in the hotel room,

there is no reasonable probability the outcome of trial would have been different if

Attorney Pfeiffer had included the two small towels in the motion in limine.

Finally, the state court reasonably concluded that Petitioner failed to

demonstrate he was prejudiced by Attorney Pfeiffer's failure to obtain DNA testing

of the towels.  Any suggestion as to what the results of DNA testing would have been

is purely speculative.  The state court did not unreasonably apply Strickland in

determining that such speculation was insufficient to satisfy the prejudice prong.

Petitioner failed to demonstrate that the state court's adjudication of Ground

Three or Ground Four was based upon an unreasonable determination of the facts, or

that it was contrary to or an unreasonable application of Strickland.  Therefore,

Petitioner is not entitled to federal habeas relief on Ground Three or Ground Four.

D.    Ground Five:  "Denial of Effective Assistance of Counsel.  Defense
counsel failed to investigate potential alibi witnesses, develop evidence that
places the defendant before, during, and after the burglary, and to assert a
credable [sic] alibi defense in the presence of the jury that reasonably could
have proven the defendant's innocence."

Petitioner contends Attorney Pfeiffer was ineffective for failing to investigate

an alibi defense (ECF No. 1 at 24–25).  Petitioner alleges he told Pfeiffer that shortly

after John Couch dropped him off at the hotel, he was picked up at the hotel by Lora

Donahmore and her friend, and they went to the Islander Bar until the bar closed (*id.*).

(*id.*).  Petitioner alleges he told Attorney Pfeiffer that his cell phone contained two

phone numbers for Ms. Donahmore, that Ms. Donahmore "moved around a lot," and

that she was on state probation and could be located through the probation office (*id.*).

Petitioner alleges Attorney Pfeiffer also could have obtained surveillance video from

the Islander Bar (*id.*).  Petitioner further alleges he told Attorney Pfeiffer that from

6:30–10:30 a.m. on January 23, 2012, he and "Justin," the owner of a moving

company, completed a moving job, which would have proved that Petitioner was not

the burglar who fell of the balcony, because he was in good health and uninjured

within a few hours of the burglary (*id.*).  Petitioner contends there is a reasonable

probability the outcome of his trial would have been different if Attorney Pfeiffer had

investigated an alibi defense (*id.*).

Respondent contends the state court's adjudication of Ground Five was not

based upon an unreasonable determination of the facts, or contrary to or an

unreasonable application of clearly established federal law (ECF No. 10 at 45–47).

### 1.    Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

### 2.    Federal Review of State Court Decision

Petitioner presented this claim as Ground 5 in his Rule 3.850 motion (Ex. D at 144–45).  The state circuit court denied the claim on the ground that Petitioner failed to sufficiently allege he was prejudiced by counsel's alleged deficiency (ECF No. 1 at 39).  The First DCA affirmed the decision without written opinion (Ex. H).

To the extent Petitioner contends the testimony of Ms. Donahmore and "Justin," and the surveillance video from the Islander Bar would have supported an alibi defense (i.e., that he was not in the Meyers' hotel room on the night of the burglary), Petitioner failed to show he was prejudiced by Attorney Pfeiffer's failure to investigate.   Petitioner did not proffer to the state court any reliable evidence, for example, an affidavit from Ms. Donahmore or "Justin," that either of these alleged witnesses was available to testify at trial and setting forth the substance of her  or his proposed testimony.  Likewise, Petitioner presented no evidence to the state court establishing that the Islander in fact had preserved video surveillance from the night in question that could have been obtained by Mr. Pfeiffer, much less that it depicted Petitioner in the bar at or about 3:00 a.m. on January 23, 2012.  Therefore, Petitioner's allegations as to the content of Ms. Donahmore's or "Justin's" testimony was purely speculative, as was his contention that video evidence was available that would have

affected the outcome of his trial.  Additionally, in light of Petitioner's admission to Investigator Henderson that he was the person who entered the hotel room through the second floor balcony, and the DNA evidence linking Petitioner to the pillowcase discovered during the canine track of the burglar from the location where he was last seen, there is no reasonable probability the jury would have had reasonable doubt that he was the burglar even if the jury had been presented with the video from the bar and/or the testimony of Ms. Donahmore and "Justin."

To the extent Petitioner contends the testimony of Ms. Donahmore and the surveillance video from the bar would have supported the lack-of-intent defense (i.e., that Petitioner entered the Meyers' hotel room with the intent to play a joke upon Ms. Donahmore, not with the intent to assault, batter, or steal from the Meyers), Petitioner failed to demonstrate that Attorney Pfeiffer's failure to investigate and present this alleged evidence was unreasonable or affected the outcome of trial.  With regard to the surveillance video from the bar, Petitioner failed to show that the video had any probative value on the issue of his intent when he entered the Meyers' hotel room. With regard to Ms. Donahmore's alleged testimony, as discussed *supra*, Petitioner's allegations as to the content of Ms. Donahmore's testimony was purely speculative.

Petitioner failed to demonstrate that the state court's rejection of Ground Five was an unreasonable application of <u>Strickland</u>.  Therefore, he is not entitled to federal habeas relief on Ground Five.

> E.    Ground Seven:  "Denial of Effective Assistance of Counsel.  Defense counsel failed to investigate potential witness and sapeona [sic] witness to trial to bolster the description discrepancy for the defense.  U.S. Constitution, Amendment VI, XIV."

Petitioner alleges Mr. Charles Corvo was in the parking lot of the hotel during the burglary (ECF No. 1 at 28–29).  Petitioner alleges Mr. Corvo told police that approximately 30 minutes prior to the officers' arrival at the hotel, he saw a black male walk around the corner of the second floor of the hotel and look down toward the entrance of the hotel in the main parking lot (*id.*).  Petitioner alleges Mr. Corvo described the black male as having dreadlocks and wearing a gray hoodie-type jacket (*id.*).  Petitioner alleges the Meyers also described the intruder as wearing gray clothing (*id.*).  Petitioner alleges he asked Attorney Pfeiffer to investigate Mr. Corvo as a defense witness and subpoena him to testify at trial (*id.*).  Petitioner alleges Attorney Pfeiffer told him he was already investigating Mr. Corvo and would subpoena him for trial; however, just prior to trial, Attorney Pfeiffer told Petitioner that he did not need to investigate or subpoena Mr. Corvo (*id.*).  Petitioner alleges Mr. Corvo's description of the man in the gray hoodie was similar to the Meyers' initial

description of the burglar as a black male, 6'5" tall, 300 pounds, with dreadlocks and wearing gray clothing (*id.*). Petitioner contends defense counsel was ineffective for failing to present Mr. Corvo's testimony at trial and argue to the jury that Petitioner did not match Mr. Corvo's description of the man at the hotel or the Meyers' description of the burglar (*id.*). Petitioner contends if Attorney Pfeiffer had presented Mr. Corvo's testimony, there is a reasonable probability the jury would have had reasonable doubt that he was the burglar (*id.*).

Respondent contends the state court's adjudication of Ground Seven was not based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of clearly established federal law (ECF No. 10 at 50–51).

### 1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

### 2.    Federal Review of State Court Decision

Petitioner presented this claim as Ground 7 in his Rule 3.850 motion (Ex. D at 148–49). The state circuit court denied the claim on the ground that Petitioner failed to sufficiently allege he was prejudiced by counsel's alleged deficiency (ECF No. 1 at 39). The First DCA affirmed the decision without written opinion (Ex. H).

Contrary to Petitioner's allegations, the only similarity between Mr. Corvo's description and the Meyers' description was that the person was a black male wearing gray clothing.  Their descriptions were very otherwise different in that Mr. Corvo stated that the man he saw had dreadlocks, whereas both of the Meyers described the burglar's hair as "close-shaven."  Additionally, a misidentification defense had no reasonable probability of success in light of Petitioner's admission to Investigator Henderson that he entered the second floor hotel room through the balcony, and then realized that he was in the wrong room.  Further, Mr. Corvo's testimony would not have benefitted the reasonable defense theory presented by Attorney Pfeiffer, i.e., that Petitioner did not intend to commit a crime when he entered the hotel room.

The state court reasonably concluded that Petitioner failed to show he was prejudiced, in the <u>Strickland</u> sense, by Attorney Pfeiffer's failure to investigate Mr. Corvo and present his testimony at trial.  Therefore, Petitioner is not entitled to habeas relief on Ground Seven.

<p style="padding-left:2em"><b>F.    <u>Ground Eight: "Denial of Effective Assistance of Counsel.  The defense counsel errored [sic] for allowing the trial court to error [sic] in denying Defendant's motion for judgment of acquittal on the element of wearing a hood, mask, or device to conceal identity during the burglary of a dwelling."</u></b></p>

Petitioner alleges the evidence was insufficient to prove that the towel that he draped around parts of his head and shoulders concealed his identity (ECF No. 1 at

30–32).  Petitioner alleges the Meyers' testimony established that Petitioner did not conceal his face/identity (*id.*).  Petitioner acknowledges that Attorney Pfeiffer made a motion for judgment of acquittal ("JOA"), which included argument that there was insufficient evidence that the burglar was wearing a hood or mask that concealed his identity, therefore, reclassification of the offense from a second degree to a first degree felony, pursuant to Florida Statutes § 775.0845, was improper (*id.*).  But Petitioner argues Attorney Pfeiffer was ineffective for "not arguing and insisting to the court" and "allowing the court to err" by denying the motion for JOA as to this element, thus allowing the jury to decide the issue of whether the State proved that the reclassification statute applied (*id.*).  Petitioner contends that without Attorney Pfeiffer's alleged error, there is a reasonable probability the outcome of trial would have been different (*id.*).

Respondent contends the state court's adjudication of Ground Eight was not based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of clearly established federal law (ECF No. 10 at 51–52).

### 1.    Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

### 2.    Federal Review of State Court Decision

Petitioner presented this claim as Ground 8 in his Rule 3.850 motion (Ex. D at 150–52).  The state circuit court denied the claim on the ground that Petitioner failed to sufficiently allege he was prejudiced by counsel's alleged deficiency (ECF No. 1 at 39).  The First DCA affirmed the decision without written opinion (Ex. H).

Florida Statutes § 775.0845 provides that the felony degree of any criminal offense shall be reclassified to the next higher degree if, while committing the offense, the offender was wearing a hood, mask, or other device that concealed his or her identity.   The statute is aimed at criminals who employ devices either to make witnesses' identifications of them difficult or to otherwise facilitate the commission of a crime.  *See* <u>Fletcher v. State</u>, 472 So. 2d 537, 540 (Fla. 5th DCA 1985).  It is not necessary that the hood, mask, or other device cover an offender's face.  *See* <u>Clark v. State</u>, 234 So. 3d 809 (Fla. 4th DCA 2018) (affirming trial court's denial of motion for JOA as to § 775.0845 reclassification where there was evidence that victim personally knew defendant, and defendant, likely knowing surveillance camera's location from earlier visits to the home, attempted to cover only the area of his body which would be visible in the camera's view, the back of his head, by pulling shirt over back of his head while in view of camera).  The statute does not require that the offender be successful in his or her attempt to avoid identification through use of a

mask, hood, or device.  *See id.* at \*3 (citing <u>L.D.H. v. State</u>, 212 So. 3d 387, 390–91

(Fla. 4th DCA 2017) (juvenile violated section 775.0845 even though juvenile used

his shirt to cover his face for only a brief amount of time)).  "Instead, the factfinder

simply considers the totality of the evidence to determine whether the person

personally wore a hood, mask, or other device to conceal their identity."  <u>L.D.H.</u>, 212

So. 3d  at 390.

The trial transcript shows that Attorney Pfeiffer included the following

argument in his motion for JOA:

> MR. PFEIFFER:  [A]s far as the element of wearing a mask, the
> statute says—it's Section 775.0845. . . . And while committing the
> offense, the offender was wearing a hood, mask, or other that concealed
> his identity or her identity.
>
> I'm gonna move for judgment of acquittal as to that element.  The
> husband said that he did see the person's face.  It was dark.  He wasn't
> able to identify him in court, although he tried to.  But his face was not
> covered up by this towel thing he was wearing over his head.
>
> The wife said that she didn't see his face because he was facing in
> a different direction not because of anything covering his face so I don't
> think that the State's presented any evidence that the offender was
> wearing a hood or mask that concealed his identity.

(Ex. M at 209–10).

The prosecutor argued:

MR. PARKER:  Judge, actually, the testimony I believe is that he covered his head.  The sides of his face.  The only part that was visible was just the facial portion.  And I believe that that this is covered in the statute.  It is certainly an intent to conceal one's identity.  And quite often, the individuals who, for example, go into a bank to commit a bank robbery will wear a cap to help conceal their identity or they'll wear a hood when they go into rob a convenience store.  Obviously, the face is still exposed however, their attempt to conceal some of ability to identify them such as hair color, length of hair, size of their ears, whatever. Things that would be identifying features are concealed.  You don't have to conceal everything about the person's physical identity but an attempt to conceal that in some way.  And I think there was evidence that that was done in that case.

(Ex. M at 210–11).

Attorney Pfeiffer responded:

MR. PFEIFFER:  I think that the testimony you heard from the two victims, they didn't—there was nothing they said that indicated that this towel or whatever it was prevented them from identifying anybody.

(Ex. M at 211).  The trial court denied the motion for JOA (*id.*).

Petitioner failed to show a reasonable probability that the trial court would have granted the motion for JOA as to the hood or mask element if Attorney Pfeiffer had argued the motion any differently.  Therefore, the state court reasonably concluded that Petitioner failed to show he was prejudiced, in the Strickland sense, by Attorney Pfeiffer's failure to argue the motion differently.  Petitioner is not entitled to habeas relief on Ground Eight.

G.     Ground Nine:  "Denial of Effective Assistance of Counsel.  Defense counsel failed to seek a continuance after arraignment on the new amended charges of a first degree felony with a maximum sentence of 30 years."

Petitioner contends Attorney Pfeiffer was ineffective for failing to seek a continuance after the State amended the information, on the morning of trial, to add assault and battery to the list of alternative crimes that Petitioner intended to commit when he entered the Meyers' hotel room, and to reclassify the burglary from a second degree felony to a first degree felony pursuant to Florida Statutes § 775.0845 (ECF No. 1 at 33).  Petitioner contends there is a reasonable probability the outcome of trial would have been different if Attorney Pfeiffer had sought a continuance to prepare for the addition of assault and battery as additional alternative crimes, for example by deposing the Meyers (*id.*).

Respondent contends the state court's adjudication of Ground Nine was not based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of clearly established federal law (ECF No. 10 at 53–54).

1.     Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

2.     Federal Review of State Court Decision

Petitioner presented this claim as Ground 9 in his Rule 3.850 motion (Ex. D at 153). The state circuit court denied the claim on the ground that Petitioner failed to sufficiently allege he was prejudiced by counsel's alleged deficiency (ECF No. 1 at 39). The First DCA affirmed the decision without written opinion (Ex. H).

As discussed *supra* in Ground Two, Petitioner failed to show that additional time to investigate would have led to any evidence helpful to the defense. As previously discussed, Petitioner's only reasonable defense strategy was to argue that there was insufficient evidence that he intended to commit a crime in the Meyers' room when he entered it. Petitioner failed to show that State's amending the information to include assault and battery in the list of alternative crimes that Petitioner intended to commit required a modification of the defense strategy or more time to investigate.

The state court reasonably concluded that Petitioner failed to show he was prejudiced by Attorney Pfeiffer's failure to seek a continuance upon the State's amending the information. Therefore, Petitioner is not entitled to habeas relief on Ground Nine.

H.    Ground Ten: "Denial of Effective Assistance of Counsel. Defense counsel failed to cross-examine the police investigator to take away credability [sic] as a State's witness on his false statement and claims he said on record. U.S. Constitution, Amendment VI, XIV."

Petitioner contends Attorney Pfeiffer was ineffective for failing to cross-examine and impeach Investigator Henderson's trial testimony (ECF No. 1 at 34–35). Petitioner argues Attorney Pfeiffer should have questioned Investigator Henderson about whether the Meyers' change in their physical description of the burglar, to match Petitioner's physical description, occurred because Henderson provided them information about Petitioner (*id.*). Petitioner alleges Investigator Henderson admitted in his pre-trial deposition that he may have provided the Meyers with information about Petitioner (*id.*). Petitioner alleges Investigator Henderson also lied when he testified that he did not recall the names of the persons on Petitioner's "alibi list," i.e., the acquaintances whom Petitioner stated he was meeting at the hotel on the night of the robbery (*id.*). Petitioner contends there is a reasonable probability the outcome of trial would have been different if Attorney Pfeiffer had more adequately cross-examined Investigator Henderson (*id.*).

Respondent contends the state court's adjudication of Ground Ten was not based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of clearly established federal law (ECF No. 10 at 54–56).

1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

2.    Federal Review of State Court Decision

Petitioner presented this claim as Ground 10 in his Rule 3.850 motion (Ex. D at 154–55).  The state circuit court denied the claim on the ground that Petitioner failed to sufficiently allege he was prejudiced by counsel's alleged deficiency (ECF No. 1 at 39).  The First DCA affirmed the decision without written opinion (Ex. H).

Petitioner contends Attorney Pfeiffer was ineffective for failing to question Investigator Henderson about whether the change in the Meyers' physical description of the burglar, to match Petitioner's physical description, occurred because Henderson provided them information about Petitioner.  Petitioner submitted a portion of Investigator Henderson's pre-trial deposition testimony to the state court to support his claim.  The relevant deposition testimony is the following:

> Q:  Did y'all have any conversation about that discrepancy?
>
> A [by Investigator Henderson]:  She just said that it was dark, as I recall, and that it all  happened so fast because it was like the were [sic] hours of the morning.
>
> Q:  When you talked to her, how many times did you talk to her?
>
> A.  Maybe twice.  One was to ask her about the case and then I called a second time and told her that I would send her a statement for them to fill out.
>
> Q:  So the only real discussion was during the first phone call?

A:  I believe it was.

Q:  Okay.  During that phone call, whose—who brought up the issue of the height, weight first, was it you or did she mention it?

A:  I don't recall.

Q:  Just tell me how much of that conversation you do remember, like who said what?

A:  I remember her talking to me and her husband, who was in the same room, I guess, with her having a discussion over his discrepancy and his size and was it possible that, you know, they made an error on his size.  And then she, I guess, was looking at her husband's height and give [sic] me the description of the suspect and her perspective.  I don't recall exactly what she said about him, other than she didn't think he was as big as originally alleged on, I guess, on the 911 call.  I didn't give her a description of Eric [Petitioner] and I'm not sure that—I'm trying to remember what time that was and do you have a copy of the statement?

Q:  The written statement?

A:  Of when it was in regards to—

Q:  The written statement is dated February the 1st.  The incident was on January the 23rd.

A:  I think I told her that I was going to send her, either through scanned e-mail, a statement form for her to fill out, to notarize and to mail back, as best as she could remember.

Q:  And you didn't give her any kind of description of what Eric Theorgood—

A:  I didn't know what I did.

Q:  Height or weight or anything?

A:  I told her that we had a suspect and that he was a black male. I didn't give them heights.

Q:  Did you mention—did you tell them the name of the suspect?

A:  I don't know if I told them the name of the suspect.

Q:  Would you normally—

A:  And it wouldn't have mattered to them because they wouldn't have known him anyway.

(Ex. D at 181, 184–86).

The trial transcript, which was also part of the state court record, shows that the prosecutor did not question Investigator Henderson about his conversations with the Meyers; therefore, any attempt to cross-examine Henderson on this subject would have been outside the scope of cross-examination.  But even if Attorney Pfeiffer had asked Investigator Henderson what, if any, identifying information he provided to the Meyers, Petitioner failed to show a reasonable probability the result of trial would have been different.  Petitioner proffered no evidence suggesting that Investigator Henderson's trial testimony on this subject would have been inconsistent with his deposition testimony.  Therefore, Petitioner's assertion that Attorney Pfeiffer's questioning would have affected the jury's assessment of Henderson's credibility is

purely speculative. Indeed, Henderson's trial testimony on this subject may have been completely consistent with his deposition testimony; in which case, such questioning would not have had any impeaching effect. And if the jury heard Investigator Henderson's testimony on this subject, there is no reasonable probability the jury would have had reasonable doubt as to whether Petitioner was the man who entered the Meyers' room. Petitioner admitted to Investigator Henderson that (1) he climbed up onto the second floor balcony and entered a room in an attempt to scare the occupants; (2) he burned holes in the pillowcase because he intended to use it to scare the occupants; (3) the occupants, a male and female, attacked him; (4) he and the occupants struggled back out of the room onto the balcony; and (5) Petitioner fell off the balcony during his attempt to get away. Additionally, DNA evidence linked Petitioner to the bloody pillowcase and the towel (bearing a hotel label) located during the canine track from the place where the burglar fell off the balcony. The state court's rejection of this aspect of Petitioner's IATC claim (i.e., Attorney Pfeiffer's failure to question Henderson about whether he provided information about Petitioner to the Meyers prior to Mrs. Meyer's changing her physical description of the burglar) was not an unreasonable application of Strickland.

Petitioner additionally contends Attorney Pfeiffer was ineffective for failing to point out to the jury that Investigator Henderson lied when he testified he could not recall the names of alleged alibi witnesses that Petitioner provided.  Henderson's testimony was the following:

Q [by the prosecutor]:  Did you, at some point, have contact with him [Petitioner]?

A:  Yes.

Q:  Can you tell us when that was?
. . . .
A:  I believe it was on the 9th of February, he contacted me on the telephone after seeing something on Channel 3 news with his picture.

Q:  And how did that come about that something aired on Channel 3?

A:  Channel 3 ran a story and I gave them the information that he was a person of interest.

Q:   And did that include a picture of him?

A:  It did.

Q:  Subsequent to that airing, he contacted you?

A:  Yes.

Q:  Did he identify himself?

A:  He did.

Q:  Did he give you any other identifying information concerning who he was?

A:  His date of birth and social security number.

Q:  What did he say to you when he called?

A:  He wanted to know why his photo was on the news.  The footage also ran at the same time of a Texaco burglary that we had, and the stories were like one after the other using Gulf Breeze at the same time so he originally thought he was wanted for a robbery at the Texaco.

Q:  Did you clarify that for him?

A:  I told him, yes, it was not the Texaco.

Q:  Did you let him know what it was that he was a suspect?

A:  Yes.

Q:  And after you told him that, what did he say?

A:  He denied it at first.

Q:  And that first contact was just by phone?

A:  Yes.

Q:  Did you have any other contact with him after that day:

A:  Yes.

Q:  Do you know when?

A:  I don't remember the exact dates.  We talked several times or he would contact me.

Q:  And on those occasions, was it the same person called who had called previously?

A:  Yes.

Q:  Did he identify himself as Eric Theorgood?

A:  Yes.

Q:  And what did he say to you on those other occasions?

A:  It finally came to where I explained some of the evidence that I had.

Q:  And what did he say?

A:  And once he heard that, he explained to me that it was a joke that had gone bad.

Q:  Did he tell you anything more about what had taken place?

A:  He told me that he was to meet some acquaintances at the motel and he was—he got to the motel and decided he would scare them. He climbed up on the second-floor balcony and entered a room and then realized that it was not the right room.
. . . .
Q:  Did he say anything to you about where he had been before he went to the Quality Inn?

A:  I don't know if it was on that same conversation but he had, I think, originally denied being there and said he was at the bar—the Mustang Bar in Gulf Breeze or out towards midway.

Q:  When he said to you that he had been at the hotel and that he was playing a joke, did he tell you anything else about what he had done?

A:  I asked him about the holes in the pillowcase that was found. He stated that he used a cigarette lighter to make the holes in the pillowcase which he was gonna use to scare the people in the room.

Q:  Did he know the names of these friends?

A:  One of the acquaintances, he said, was a female with red hair but he didn't know her last name.  I don't remember what her first name was.  I asked him if he could try to provide that so I could corroborate his story.  He never—he said she was out of the country.
. . . .
Q:  Did you discuss with him, what had actually taken place that night there in Room 260 of the Quality Inn?

A:  He asked me what the charges were.  I told him it would be burglary and battery.  And he explained to me that he was the one battered by the victim when he was standing in the room.  He tried to get away when he was tackled by them thus falling over the balcony onto the ground where he injured himself.

Q:  Officer, did you attempt to locate the individuals that he had claimed he went there to play a joke on that night?

A:  He never—I never received anymore names to verify.

Q:  You never were able to locate anyone?

A:  Only the gentleman who took him to the hotel.

Q:  And what was his name?

A:  Mr. Couch.

Q:  Is that John Couch?

A:  Yes, sir.

(Ex. L at 186–90).

Attorney Pfeiffer's cross-examination included the following:

Q [by Attorney Pfeiffer]: Now, when you said that you had some information about this, you asked Channel 3 to run the story. And after they did run the story, that's when Mr. Theorgood called you on the phone?

A: That's right.

Q: So he called you?

A: That's right.

Q: And did he just call you one time or several times?

A: Several times.

Q: Did you recall if he gave you any names of people that you had—that he had been suppose [sic] to be meeting up with that night?

A: It was just a girl's name without a last name—a first name.

Q: You don't recall the name?

A: I do not.

Q: Did you try to track it down at all?

A: There was—just by first name.

Q: So we never verified that one way or the other?

A: That's correct.

. . . .

Q:  Judge, can I approach the witness?

A:  Certainly.

Q:  Sir, can you just take look at that quietly to yourself?  Does this refresh your memory about any names that Mr. Theorgood may have given you?

A:  No.

Q:  Okay.

A:  That was done by another officer.

Q:  But again, whatever information you had was never tracked back to anybody or verified or unverified, I should say?

A:  Her name wouldn't have matched anything I had.  I didn't find a girl's name.

(Ex. L at 194–97).

Petitioner alleges Attorney Pfeiffer was deficient for "not catching and pointing out a lie from Investigator Henderson," when Henderson testified that Petitioner's "alibi list" did not refresh his recollection about name(s) that Petitioner provided Henderson during their phone conversations (*see* ECF No. 1 at 35).  Although Attorney Pfeiffer could have "pointed out" that Henderson's testimony, that the name on the list did not match the female's first name that Petitioner provided him, appeared to be inconsistent with his earlier testimony, that he could not recall the name that

Petitioner provided him, Petitioner failed to show a reasonable probability that counsel's pointing out this seeming inconsistency would have changed the jury's assessment of Investigator Henderson's credibility such that they would have disbelieved Henderson's testimony that Petitioner admitted he was the person who entered the hotel room on the night of the burglary.  This is especially so in light of the DNA evidence linking Petitioner to the bloody pillowcase and the large towel (bearing a hotel label) located during the canine track from the place where the burglar fell off the balcony.

The state court reasonably concluded that Petitioner failed to show he was prejudiced by Attorney Pfeiffer's alleged deficiencies in his cross-examination of Investigator Henderson. Therefore, the state court's adjudication of Ground Ten was not an unreasonable application of Strickland.  Petitioner is not entitled to habeas relief on Ground Ten.

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  If a certificate is issued "the court must state the specific issue or issues that satisfy the showing

required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice

of appeal must still be filed, even if the court issues a certificate of appealability.  28

U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has

made a 'substantial showing of the denial of a constitutional right.'"  Miller-El v.

Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting

§ 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has

shown that 'jurists of reason could disagree with the district court's resolution of his

constitutional claims or that jurists could conclude the issues presented are adequate

to deserve encouragement to proceed further.'"  Buck v. Davis, 580 U.S.—, 137 S. Ct.

773 (2017) (citing Miller-El, 537 U.S. at 327).  The petitioner here cannot make that

showing.  Therefore, the undersigned recommends that the district court deny a

certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order,

the court may direct the parties to submit arguments on whether a certificate should

issue."  Thus, if there is an objection to this recommendation by either party, that party

may bring this argument to the attention of the district judge in the objections

permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 28th day of March 2018.


                              /s/ *Elizabeth M. Timothy*
                              **ELIZABETH M.  TIMOTHY**
                              **CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.** A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.

Case No.: 3:16cv383/LAC/EMT